Lawrence E. HUMFELD and Maurice Brown, d/b/a B & H Real Estate Company, Plaintiffs-Respondents,

v.

Norbert E. LANGKOP and Dorothy Langkop, Defendants-Appellants.

No. KCD 30513.

Missouri Court of Appeals, Western District.

Dec. 3, 1979.

John T. Kay, James F. Crews, Kibbe, Crews & Gaw, California, for defendants-appellants.

George A. Spencer, Columbia, William A. Spencer, Jefferson City, for plaintiffs-respondents.

Before WASSERSTROM, C. J., and WELBORN and SMITH, Special Judges.

WASSERSTROM, Chief Judge.

Suit for brokerage commission. On the first trial which was held in Cooper County, the jury found for the defendants, but the trial judge granted a new trial on the ground that the verdict was against the weight of the evidence and that there was no substantial evidence to support the ver-

dict. The case was then retried before a different judge in Cole County, resulting in a jury verdict in favor of plaintiffs for $6,750, from which defendants pursue this appeal.

Defendant land owners had been trying for about two years to sell their farm. Those efforts were unsuccessful and on April 28, 1975, they entered into a listing agreement appointing the plaintiff brokers as exclusive agents to sell their land for a period of 60 days at a price of $158,000, at a commission of 5% to be paid if a buyer were found within the time the agreement was in force. Plaintiffs promptly put signs on the property, advertised, and did produce two prospects, but no one who was willing to meet defendants' asking price.

As the end of the 60 day exclusive period neared, the parties discussed what they ought to do about it. Plaintiff Humfeld testified that he told defendant Norbert Langkop that "we would be happy with an open listing and we would keep trying to sell it, and he could list it with somebody else, or sell it his [sic] self if he had a chance. * * * He told me to go ahead and leave my signs over there and try to sell it." Plaintiff Brown confirmed that a conversation occurred with Langkop in which it was agreed that "we would go ahead and keep working on it, we would leave our signs up and work on an open listing." There was no contradiction to that testimony, nor was there any contradiction to plaintiffs' testimony that they did leave their signs on the property and continued advertising the property at all times here pertinent.

Plaintiffs' continued efforts did subsequently produce Ronald B. Wenneker as a prospective buyer. The parties disagree on when he was first introduced by plaintiffs to defendants. Defendants' testimony was that this occurred in the fall of 1975. Plaintiffs' testimony was that Wenneker was introduced in February or March 1976. Regardless of which date be accepted, there is no dispute but that Wenneker did make an offer to trade property owned by him for defendants' farm. This offer was dis-cussed and taken under consideration by defendants. They ultimately rejected the offer on the ground that they wanted to receive cash rather than a trade.

Sometime in April, Brown met Wenneker at a restaurant, and some rather casual conversation about defendants' farm took place. Sometime soon thereafter, Wenneker on his own initiative called defendant Norbert Langkop and renewed negotiations for the farm. Langkop at that time told Wenneker that he would accept $150,000. In cross-examination Langkop admitted that he arrived at that figure on the basis that "I knocked off the commission, because I was the one that sold it, they [plaintiffs] never sold it."

On May 4, 1976, a salesman, Davis, employed by plaintiffs, called Langkop to see about bringing around a new prospect for the farm. At that time Langkop turned Davis away with a statement that he thought he had a purchaser. Davis called again on May 16, 1976, and Langkop informed him that he had already definitely sold the property. Plaintiffs then checked the courthouse records and found that the purchasers were Mr. and Mrs. Ronald B. Wenneker.

## I.

Defendants' first point on appeal is that the trial court erred in failing to grant them a new trial on the ground of perjured testimony on the part of plaintiff Brown. The facts concerning this issue are as follows. At the first trial of this case, Brown was asked on cross-examination about the time of the meeting when plaintiffs first introduced Wenneker to the defendants, and Brown testified at that time as follows:

"Q And the other transactions, in talking to him, was in '75, wasn't it?

A That's right.

Q And it was in the fall of '75, was it not?

A I don't think so.

Q Just use your own memory, if you would—

A I haven't got any dates.

"Q You think it was in '75 somewhere? Is that correct? Without looking over here and seeing Mr. Spence—

A That's right. I think it was '75.

MR CREWS: Fine. I have no further questions."

At the second trial, plaintiffs' counsel again went into this matter of time in his cross-examination of Brown, and that examination proceeded as follows:

"Q. Now, Mr. Brown, can you tell me whether or not you testified on a prior occasion under oath that the meeting between Wenneker and Langkop was in 1975?

A. I don't think so.

Q. You say you don't remember your testimony before in this matter?

A. I don't think it was '75.

Q. Could you have stated that it was in 1975?

A. No, I don't think so.

Q. If the Court record would show that you had testified to that fact before it would be wrong; is that correct? ·

A. I don't know whether I understand quite what you want to know.

Q. Did you not testify in the Circuit Court of Cooper County, Missouri on the 7th day of December, 1977, that the meeting between the Langkops, you, Mr. Humfeld and Mr. Wenneker took place in 1975?

A. No.

Q. You didn't testify to that fact; is that your testimony today?

A. No.

Q. And your testimony today is that this conversation took place in February or March of 1976; is this correct?

A. The conversation at the coffee shop?

Q. No, no, no; the conversation in which you had the property trade set up between the Langkops and Wenneker, when they came to Columbia and you all went out and looked at the property; I believe you testified to.

A. It was—as I remember, it was kind of cold weather.

Q. Well, I believe you testified on direct examination of your attorney that it was in February or March of '76.

A. Yes, I believe that's right.

Q. Do you have anything to peg it to that time, any notes or memorandum, phone bills, anything like that?

A. No, I don't think I have."

In the course of this latter cross-examination, Brown was not confronted with any transcript of his former testimony, nor was any such transcript introduced at any time during the second trial. Defendants' counsel apparently procured the transcript of Brown's earlier testimony only after the conclusion of this second trial. He then offered that transcript to the trial judge in support of defendants' motion for a new trial in which they argued, as they do here, that Brown committed perjury at the second trial.

█ The granting of a new trial on the ground of perjury requires a showing that the witness willfully and deliberately testified falsely. *Carson v. Hagist*, 143 S.W.2d 355 (Mo.App.1940). See also *State v. Barkwell*, 585 S.W.2d 149[7] (Mo.App.1979), and *State v. Vidauri*, 305 S.W.2d 437 (Mo.1957). In this regard, perjury is more than and must be distinguished from a mere mistake in testimony. *Carson v. Hagist, supra.* Moreover, it rests largely within the discretion of the trial court to determine whether perjury occurred and whether an improper verdict was thereby occasioned; and the action of the trial court will not be reversed unless the appellate court is satisfied that the trial judge abused his discretion. *Calvin v. Lane*, 297 S.W.2d 572 (Mo.App.1957); *Donati v. Gualdoni*, 358 Mo. 667, 216 S.W.2d 519 (1949); *Gavin v. Forrest*, 230 Mo.App. 662, 72 S.W.2d 177 (1934); *Buehler v. Baum*, 71 S.W.2d 851 (Mo.App.1934); *Carson v. Hagist, supra.*

█ There was no abuse of discretion here. Brown's testimony at both the first and second trial was somewhat equivocal. Brown stated that he had *no memorandum* or other basis upon which to refer, and it is not surprising that this 77 year old man·

would be uncertain in memory as to the time when the meeting in question took place. It is significant that Brown was not confronted with his first testimony so that he might have a chance to refresh his recollection of what his testimony had been at the first trial. It is also important to observe that Humfeld and Davis also testified that the meeting in question occurred in February or March, 1976. Thus, even if the testimony of Brown be completely disregarded, there was still substantial evidence on which the jury could find and believe that the meeting took place in February or March, 1976, as Brown testified at the second hearing.

In any event, we cannot say on this record that the trial court abused its discretion in refusing to find that Brown intentionally and deliberately perjured himself, nor can we say that the trial court could not have reasonably concluded that Brown's testimony did not produce an improper verdict. Defendants' first point on appeal is therefore overruled.

## II.

For their second point, defendants argue error in Instruction No. 4, which follows MAI 4.06, the approved damage instruction for a claim in quantum meruit.[1] It is doubtful whether this point has been properly preserved since defendants' motion for new trial does not so much as mention Instruction No. 4. Nevertheless, defendants did complain in their motion for new trial that plaintiffs failed to introduce evidence as to what was a fair and just commission, and this is essentially the argument which they now present under their Point II on this appeal.[2] Giving defendants the benefit of a very generous application of the pertinent rules, we will review their basic contention to the extent that it is set forth in paragraph 3 of their motion for new trial.

In considering the sufficiency of plaintiffs' evidence, the written and subsequent oral contract between the parties must be taken into account. This is true even though plaintiffs elected to submit their case on quantum meruit. Where a plaintiff has fully performed a contract and all that remains thereunder is payment by the defendant, the plaintiff has a choice at his option of either suing on the contract or waiving the contract and suing in quantum meruit. *Perles & Stone v. Childs Co.*, 337 Mo. 448, 84 S.W.2d 1052 (1935); *Steward v. Droste*, 294 S.W.2d 600 (Mo.App.1956); *Fuldner v. Isaac T. Cook Co.*, 127 S.W.2d 726 (Mo.App.1939). And if the plaintiff elects to proceed on quantum meruit, he may introduce the contract in evidence as prima facie evidence of reasonable value. *Stewart v. Droste, supra; Curators, etc. v. Nebraska Prestressed Concrete*, 526 S.W.2d 903 (Mo.App.1975); *Brummet v. Livingston*, 384 S.W.2d 101 (Mo.App.1965); *Cavic v. Missouri Research Laboratories, Inc.*, 416 S.W.2d 6 (Mo.App.1967); *Knoch v. Frye*, 363 S.W.2d 737 (Mo.App.1963); *Fuldner v. Isaac T. Cook Co., supra.*

Here the parties had a written exclusive contract for a 5% commission which expired in June 1975. The plaintiffs testified without contradiction that the written contract was orally extended upon an open listing basis. It can be inferred that the open listing was on the same 5% basis as the original exclusive listing. This inference is supported by the decision in *Carlson v. Klauer*, 329 Mass. 398, 108 N.E.2d 664 (1952). In *Carlson*, plaintiff brought an action to recover for services in procuring a customer for certain real estate of the defendant. At some point, defendant offered to sell the property to customers of the plaintiff and agreed to pay the plaintiff a

---

1. Defendants' Point II reads in full as follows: "The Trial Court Erred in Permitting Submission of Respondents' Instruction No. 4 in That Neither the Pleadings nor the Evidence Are Sufficient to Support Such Submission As a Matter of Law."

2. Paragraph 3 of the motion for new trial alleged: "That Plaintiffs wholly failed to introduce evidence as to what a fair and just commission under the circumstances was, and that the failure to do so caused the jury to speculate as to damages claimed by the Plaintiffs and in arriving at their verdict."

5% commission. This "deal," however, as stated by the court "fell through." Nevertheless, while employed by the defendant in a different capacity, plaintiff located a buyer. Of particular importance was the court's emphasis on the testimony that defendant told the plaintiff "to interest Wong Shew [the prospective buyer] and that the defendant would take care of the plaintiff." Based on this evidence, the court stated:

"The defendant contends that, because there was no evidence as to the fair value of the services of the plaintiff referred to in count 2, the motion for a directed verdict for the defendant should have been allowed. He relies upon what was said in *Driscoll v. Bunar*, 328 Mass. 398, 403–404, 103 N.E.2d 809. In that case there was no evidence that the defendant promised to pay any percentage of the sale price and there was no evidence as to what would be a fair and reasonable charge for the plaintiff's services. It was held to be error to submit the question of substantial damages to the jury, and a new trial was ordered on damages only.

"While it is true that in the instant action there was no direct evidence of the fair value of the plaintiff's services, there was evidence in our opinion that the plaintiff was to receive a commission of 5% of the sale price paid by Wong Shew less a credit of $100 paid to the plaintiff by the defendant. There was evidence that the defendant agreed to pay the plaintiff a commission of 5% if the first transaction went through. When that deal failed the defendant urged the plaintiff to continue his efforts and as a result he procured Wong Shew who paid $19,000 for the property. When the defendant told the plaintiff that he would take care of him, the jury had a right reasonably to infer that the defendant meant that he would take care of the plaintiff on the same basis as agreed to in the earlier transaction, and that the plaintiff relied upon this meaning in continuing his efforts on behalf of the defendant."

Just as in *Carlson*, so also here plaintiffs reasonably relied upon an understanding that the 5% commission would continue in effect for the purpose of the open listing.

 Defendants attempt to expand their Point II by arguing that Instruction No. 4 is not supported by the pleadings. No such complaint of variance was preserved by the motion for new trial as required by Rule 78.07[3] and cannot be urged now. *Herford Concrete Products, Inc. v. Aerobic Services, Inc.*, 565 S.W.2d 176 (Mo.App.1978); *Economopoulos v. Curls*, 377 S.W.2d 522 (Mo.App. 1964); *Bower v. Hog Builders, Inc.*, 461 S.W.2d 784 (Mo.1971); *Skeleton v. General Candy Co.*, 539 S.W.2d 605 (Mo.App.1976).

### III.

 For their third point on appeal, defendants object to Instruction No. 3, which follows MAI 29.03, the approved verdict-directing instruction for use in a case for "Real Estate Commission—Sale Consummated—No Agreed Commission." They claim this instruction was erroneous in that it contained no requirement that the jury find that plaintiffs were employed as brokers at the time defendants sold the farm to the Wennekers. This objection cannot be considered, because it has not been properly preserved. There was no objection to the instruction prior to submission to the jury, nor was there any point concerning this matter in the motion for new trial. See authorities cited in the last paragraph under Part II of this opinion.

The judgment is affirmed.

ALL CONCUR.

---

**3.** Rule 78.07 provides in part as follows: "Any specific objections to instructions which were not made at the trial before submission to the jury, must be set forth in the motion for new trial to preserve the error for review." The record shows no objection to the instruction before submission to the jury.